Samuel ARTIST, Plaintiff,

v.

VIRGINIA INTERNATIONAL TERMINALS, INC., et al., Defendants.

Civ. A. No. 87–441–N.

United States District Court, E.D. Virginia, Norfolk Division.

Feb. 10, 1988.

Neil C. Bonney, White & Selkin, Norfolk, Va., for plaintiff.

Dean T. Buckius, John M. Ryan, Vandeventer, Black, Meredith & Martin, Norfolk, Va., for defendants.

## ORDER

DOUMAR, District Judge.

Plaintiff filed this action under 42 U.S.C. § 1983 and pendent jurisdiction. Count One of the complaint alleges defendants tortiously interfered with plaintiff's employment contract and seeks money damages. Count Two of the complaint alleges defendants deprived plaintiff of due process rights guaranteed by the fourteenth amendment of the United States Constitution and seeks money damages pursuant to § 1983. Significantly, plaintiff does not desire equitable relief, such as a mandatory injunction to provide notice and hearing, but simply requests money damages.[1]

This case is before the Court on Cross Motions for Summary Judgment. For the reasons stated below, the plaintiff's motion is DENIED and the defendants' motion is GRANTED. Accordingly, this case is DISMISSED.

## I. FACTS

In September 1985, plaintiff was employed as a tractor-trailer driver by Service Transfer, Inc., a company which transports ship containers from terminals operated by defendant, Virginia International Terminals (VIT). On September 5, 1985, plaintiff was involved in a fight on VIT's premises with

---

1. While a § 1983 plaintiff may seek certain equitable relief from state officials, an action for money damages from the state treasury arising from the same complaint would be barred by the eleventh amendment. *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

one of VIT's employees. As a result of this fight, defendant Giesinger, Manager of Operations for VIT, by letter dated September 12, 1985, barred plaintiff from the terminal property pursuant to regulations promulgated by VIT. This letter was addressed to plaintiff and a copy was apparently sent to plaintiff's employer, Service Transfer, Inc.

After this debarment, plaintiff continued to work for Service Transfer until October 4, 1985 at which time plaintiff voluntarily terminated his employment. Although plaintiff was not terminated involuntarily, his utility to Service Transfer and consequently his income were diminished. By this action, plaintiff is attempting to gain compensation for this diminished income.

The Norfolk International Terminals are owned by the Virginia Port Authority (VPA) and operated by VIT. VIT is a non-stock, non-profit corporation formed pursuant to Chapter 2 of Title 13.1 of the Code of Virginia. VIT is wholly owned by VPA, an agency of the Commonwealth of Virginia. In addition, VIT's directors are selected by VPA and VPA's Executive Director is a permanent member of VIT's Board.

## II. DISCUSSION

The complaint alleges two causes of action, one based on the Civil Rights Act and the other based on Virginia tort law. Each cause of action will be considered separately below.

### A. *Civil Rights Act.*

42 U.S.C. § 1983 provides that

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action

at law, suit in equity, or other proper proceeding for redress....

Plaintiff's § 1983 count is based on defendants' alleged deprivation of plaintiff's fourteenth amendment rights. In this regard, plaintiff claims that defendants deprived him of both "property" and "liberty" without due process of law.

To determine whether liability may exist under § 1983, the Court must determine first whether defendant acted "under color" of state law, and second whether plaintiff has alleged deprivation of any protected "property" or "liberty" interest. If the answer to either is negative, then § 1983, by its terms, will not apply in this case. *See generally Buchanan, Challenging State Acts of Authorization under the Fourteenth Amendment: Suggested Answers to an Uncertain Quest,* 57 Wash.L. Rev. 245 (Mar. 1986).

#### a. *Under Color of State Law*

This first question "is the same question posed in cases arising under the [f]ourteenth [a]mendment: is the alleged infringement of federal rights 'fairly attributable to the State?'" *Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418 (1982) (quoting *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982)). Therefore, the threshold issue is whether the alleged action of defendant VIT, a private corporation, is "fairly attributable to the State." *Id.*

In interpreting the Supreme Court's cases on the "somewhat elusive terrain of the doctrine of state action," the Fourth Circuit has indicated that the following factors should be considered: "(1) the extent and nature of public funding to the institution, (2) the extent and nature of regulation on the institution, (3) whether the institution's activity constitutes a public function 'in the exclusive preogative' of the state, and (4) whether there is a 'symbiotic relationship' between the institution and the state." [2] *Hicks v. S. Md. Health Sys.*

---

**2.** The Court notes that this formulation of criteria is not intended to serve as an inflexible mechanistically applied test. The *Hicks* Court indicated that "while a list of factors is 'helpful

in determining the significance of state involvement, "there is no specific formula for defining state action." '" *Hicks,* 737 F.2d at 402 n. 3 (quoting *Howerton v. Gabica,* 708 F.2d 380, 383

*Agency,* 737 F.2d 399, 402 (4th Cir.1984) (citing *Rendell–Baker v. Kohn,* 457 U.S. 830, 839–43, 102 S.Ct. 2764, 2770–72, 73 L.Ed.2d 418 (1982)).

Plaintiff's attribution argument is based upon the fourth criteria, that a symbiotic relationship exists between VIT and VPA. Plaintiff cites *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) in support of this contention. *Burton* involved racial discrimination by a privately owned restaurant which leased space within a public parking garage owned and operated by the Wilmington Parking Authority.

Under Delaware law, the parking authority had the following powers and privileges:

> [T]he Authority is granted wide powers including that of constructing or acquiring by lease, purchase or condemnation, lands and facilities, and that of leasing "portions of any of its garage buildings or structures for commercial use by the lessee, where, in the opinion of the Authority, such leasing is necessary and feasible for the financing and operation of such facilities." § 504(a). The Act provides that the rates and charges for its facilities must be reasonable and are to be determined exclusively by the Authority "for the purposes of providing for the payment of the expenses of the Authority, the construction, improvement, repair, maintenance, and operation of its facilities and properties, the payment of the principal of and interest on its obligations.... § 504(b)(8). The Authority ... may issue its own revenue bonds which are tax exempt.

*Burton,* 365 U.S. at 718, 81 S.Ct. at 858. Pursuant to these statutorily conferred powers, the Parking Authority entered into a twenty year lease with defendant restaurant to augment the financing of the lot construction. *Id.*

The *Burton* Court stated that "the peculiar relationship of the restaurant to the parking facility in which it is located confers on each an incidental variety of mutual benefits." *Burton,* 365 U.S. at 724, 81 S.Ct. at 861. Among the benefits to the restaurant were the added parking convenience to its customers and certain tax advantages by virtue of its association with the State. *Id.* Correspondingly, the Parking Authority benefited from added revenue derived both from rent payment and increased parking drawn by the restaurant. *Id.* Accordingly, the court held that because the State had "so far insinuated itself into a position of interdependence with [the restaurant] that it must be recognized as a joint participant in ... challenged activity" which could no longer be considered "purely private."[3] *Id.* at 725, 81 S.Ct. at 862.

In the instant case, VPA functions under a statutory mandate almost identical to that of the Parking Authority involved in *Burton.* VPA is authorized to acquire and lease property, Va.Code Ann. §§ 62.1–131, 132.18–132.19 (1987); establish rates for port use, §§ 62.1–132.4, 132.16; issue revenue bonds, § 62.1–140; and to utilize revenues to pay principle and interest on bond issues as well as to pay "the cost of maintaining, repairing and operating" port facilities, § 62.1–142. Furthermore, VPA functions on a tax-exempt basis. § 62.1–145.

Also like *Burton,* the VPA–VIT relationship involves a variety of mutual benefits. However, unlike *Burton,* the benefits involved here are not merely incidental, but are significant and fundamental. VIT serves as a vital organ for VPA by actually operating the terminals owned by VPA, and but for VPA, VIT would not even exist. Here, VIT's private existence is more form than substance. Accordingly, the Court finds that, based on the symbiotic relationship between VIT and VPA, that VIT's actions were state actions within the meaning of § 1983.

The Court notes the authorities which indicate that "[t]he Government may subsi-

---

(9th Cir.1983)). *See also Burton,* 365 U.S. at 722, 81 S.Ct. at 860 ("formula for recognition of state responsibility under the Equal Protection Clause is an 'impossible task'").

**3.** Subsequent cases have referred to this analysis as the "symbiotic relationship test." *E.g., Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 175, 92 S.Ct. 1965, 1972, 32 L.Ed.2d 627 (1972).

dize private entities without assuming constitutional responsibility for these actions." *San Francisco Arts & Athletics, Inc. v. Olympic Comm.,* —— U.S. ——, 107 S.Ct. 2971, 2985, 97 L.Ed.2d 427 (1987); *Blum v. Yaretsky,* 457 U.S. 991, 1010–11, 102 S.Ct. 2777, 2789, 73 L.Ed.2d 534 (1982); *Rendell–Baker,* 457 U.S. at 840, 102 S.Ct. at 2770. Furthermore, "[t]hat a private entity performs a function that serves the public does not make its acts [governmental] action." *Olympic Committee,* 107 S.Ct. at 2985 (quoting *Rendell–Baker,* 457 U.S. at 842, 102 S.Ct. at 2772). However, this case does not involve mere government subsidy or regulation, but involves actual state ownership and substantial control of the "private" entity.

Defendants introduced the opinion of the Attorney General of Virginia which states, without citation of authority, that because VIT was incorporated under the former Virginia Non–Stock Corporation Act, Chapter 2, Title 13.1, that VIT "is therefore a private entity and its employees are private employees and are not public employees of the state or any of its political subdivisions." [4] Op.Atty.Gen. (Sept. 13, 1985).

However, the Attorney General's opinion that VIT is a "private employer" is not binding insofar as the construction of the meaning and application of the Constitution and statutes of the United States in relation to what constitutes acting "under color of state law." The Court has accepted the private nature of VIT and holds only that VIT's private actions are fairly attributable to the State for the limited purposes of § 1983. The Court has not considered, and does not hold, that VIT's activities are attributable to the State for purposes of any state law action or for any other purposes.

### b. *Eleventh Amendment Immunity*

■ During oral argument defendant asserted that, if VIT's activities are attributed to the State, VIT should be afforded eleventh amendment immunity.

The eleventh amendment operates to restrict the federal judicial power granted by Article III of the Constitution. Accordingly, a state may not be sued for violating either state or federal law in federal court unless Congress specifically so provides or the state consents to such suit. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100–06, 104 S.Ct. 900, 908–911, 79 L.Ed.2d 67 (1984); *See Welch v. State Dept. of Highways and Pub. Transp.,* 55 U.S.L.W. 5046, 5049 (1987). Thus, if the state is the real party in interest, the eleventh amendment would bar the § 1983 claim.[5] The amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state, or by

4. Chapter 2 of Title 13.1 was repealed and Chapter 10 of the title was enacted in lieu thereof. 1985 Va.Acts c. 522. *See* Va.Code Ann. §§ 13.1–801 to 940 (1985). Because the essential purpose of the act remains the same, the Court assumes that the Attorney General's opinion is unchanged.

5. In *Pennhurst,* the Court indicated that "federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States' … In short, the principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art. III…." *Pennhurst,* 465 U.S. at 98, 104 S.Ct. at 906–07 (quoting *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890)).

The parties have not raised any question of VIT being entitled to common-law sovereign immunity from the claim advanced here under pendent jurisdiction.

Although common-law immunity differs from eleventh amendment immunity in certain aspects of application, (e.g., proprietary-governmental function distinction not significant in eleventh amendment cases) determination of whether an entity is a state actor for purposes of these immunities is essentially the same. *Compare Jacobs,* 495 F.Supp. at 189 *with Messina v. Burden,* 228 Va. 301, 321 S.E.2d 657 (1984) *and Hampton Roads Sanitation District v. McDonnell,* 234 Va. 235, 360 S.E.2d 841 (1987); *See generally c.f. Ohio Valley Contractors v. Bd. of Educ.,* 293 S.E.2d 437 (W.Va.1982). Therefore, the textual conclusion that VIT is not a state actor for eleventh amendment purposes compels the additional conclusion that VIT is not a state actor for common-law immunity purposes either. Because VIT is characterized for common-law immunity purposes as a private entity and not a state instrumentality, the Court need not reach the question whether VIT was performing a governmental or proprietary function while maintaining the terminals.

Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The United States Supreme Court has interpreted this language also to limit federal jurisdiction over suits in federal courts commenced against a state by one of its own citizens. *Hans v. State of Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Accordingly, the Court must determine whether the instant suit "is commenced or prosecuted against one of the United States." Here, the Court's conclusion that VIT's activities were conducted "under color" of state law does not necessarily lead to the additional conclusion that VIT is a state agency for eleventh amendment purposes. Resolution of the eleventh amendment question involves additional determinations and "lies, in part, in examining the nature of the entity created by State law ... and in determining whether the entity thus created has power sufficiently distinct and independent from the State as not to be considered merely a part of the State or merely its 'alter ego'." *Jacobs v. College of William and Mary*, 495 F.Supp. 183, 189 (E.D.Va.1980), aff'd, 661 F.2d 922 (4th Cir.), *cert. den.*, 454 U.S. 1033, 102 S.Ct. 572, 70 L.Ed.2d 477 (1981). In *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 n. 11, the Supreme Court of the United States stated:

> The general rule is that a suit is against the sovereign if "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration," or if the effect of the judgment would be "to restrain the Government from acting, or to compel it to act." *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963) (citations omitted).

In *Jacobs*, Judge Clarke illuminated this inquiry further:

> [1] [W]hether and to what extent any judgment will be payable from the state treasury; [2] the extent of funding provided to the institution by the state; [3] the extent of the state's control in appointing the governing body of the institution; [4] the degree of the institution's autonomy over its operations; [5] whether the institution is separately incorporated; [6] whether it has the power to sue and be sued and to enter into contracts; [7] whether its property is immune from state taxation; and [8] whether the institution's function is governmental or proprietary.

*Jacobs*, 495 F.Supp. at 189 (citing *Perez v. Rodriguez Bou*, 575 F.2d 21 (1st Cir.1978)).

Applying these criteria to the instant case, it is apparent that VIT is independent from the State in several key respects.

First, any judgment against VIT would not be paid out of the state treasury. Under the Virginia Port Authority Act, Va. Code § 62.1–147 (1987), "[a]ll expenses incurred in carrying out the provisions of this chapter shall be payable solely from funds provided under the authority of this chapter and no liability or obligation shall be incurred by the Authority hereunder beyond the extent to which monies shall have been provided under the provisions of this chapter." The chapter mandates that these funds are to derive from bond issues and revenues from the operation of the terminals and are not acquired from the state treasury. *See* Va.Code Ann. §§ 62.1–141 to 143 (1987). In addition, VIT has the power to sue and be sued. Va.Code Ann. § 13.1–826(1) (1985); VIT is incorporated separately under the provisions of the Virginia Nonstock Corporation Act, Va.Code Ann. §§ 13.1–801 to 941 (1985), not the VPA Enabling Act, Va.Code §§ 62.1–128 to 147.1; and VIT has the power to purchase and dispose of property, Va.Code Ann. §§ 62.1–131, 132.18–19 (1987).

Moreover, the United States Supreme Court has held that an entity without statewide authority, such as VIT, cannot be considered the "alter ego" of the State. *Moor v. County of Alameda*, 411 U.S. 693, 719–21, 93 S.Ct. 1785, 1800–01, 36 L.Ed.2d 596, *reh. denied*, 412 U.S. 963, 93 S.Ct. 2999, 37 L.Ed.2d 1012 (1973); *See also Ohio Valley Contractors v. Board of Educ.*, 293 S.E.2d 437 (W.Va.1982).

However, VIT also has several features which mitigate in favor of it being considered a state agency. VIT is immune

from taxation because it performs "essential governmental functions." Va.Code Ann. § 62.1–145. Moreover, this performance of essential governmental functions itself closely associates VIT with the State. *Id.* Further, VPA controls the functioning of VIT through VPA's power to appoint VIT's board of directors. Exhibit D, VIT Articles of Incorporation, at 2. Additionally VPA control over VIT arises from VPA's Executive Director being a permanent member of VIT's board. *Id.*

While noting that VIT has many attributes of a state agency, the Court is compelled to place particular significance on the fact that state treasury funds cannot be used to satisfy any judgment against VIT. To this effect, the Second Circuit Court of Appeals stated in *Trotman v. Palisades Interstate Park Comm'n,* that "[w]hile there are many factors which must be considered in determining whether a state instrumentality can raise the bar of the [e]leventh [a]mendment in a particular suit, the most significant is whether any liability against the agency must be paid from public funds in the state treasury." *Trotman,* 557 F.2d 35, 38 (2nd Cir.1977); *accord Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662, *reh. denied,* 416 U.S. 1000, 94 S.Ct. 2414, 40 L.Ed.2d 777 (1974); *Foremost Guar. Corp. v. Community Sav. & Loan, Inc.,* 826 F.2d 1383 (4th Cir.1987). This factor, combined with VIT's independent corporate existence compels the conclusion that VIT is not a mere "alter ego" of the state for eleventh amendment purposes. This conclusion is reinforced by the fact that Virginia, by the attorney general's opinion, has expressed the view that VIT is not an agency of the state.

While factors such as VIT's tax exempt status, performance of an "essential governmental function" and VPA's control over VIT are significant, their collective impact does not make a suit against VIT one against the State itself. Exercise of federal jurisdiction in this suit against VIT simply cannot be said to interfere with state public administration, or to expend itself against the public treasury.

Accordingly, the Court finds that VIT is not entitled to eleventh amendment immunity.

### c. *Liberty and Property Interest.*

Granting that VIT's alleged actions were conducted under color of state law and that VIT is not entitled to immunity, the Court will consider defendant's claims that plaintiff has not alleged or shown deprivation of any rights protected by the fourteenth amendment. Plaintiff claims to have alleged and shown deprivation of protected "liberty" and "property" interests. Each interest will be considered in turn.

### 1. *Property Interest*

Plaintiff asserts that his property interest in his job with Service Transfer, Inc. was deprived when VIT barred him from the terminals. Defendant claims that plaintiff had no such interest because plaintiff's job existed pursuant to an employment-at-will arrangement. In addition, defendant claims that it is not responsible for any deprivation which may have occurred because plaintiff continued to work after the debarment until he voluntarily terminated his job with Service Transfer, Inc.

The initial question is whether plaintiff's job with Service Transfer, Inc. constitutes a protected property interest within the meaning of the fourteenth amendment.

"[P]roperty interests are not created by the Constitution, but by 'an independent source such as state law'." *Skeeter v. City of Norfolk,* 681 F.Supp. 1149, 1155 (E.D.Va. 1987) (quoting *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (Brennan, J., concurring)); *accord Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). Here, the question is whether state law creates for plaintiff a constitutionally protected property interest in his former job with Service Transfer, Inc.

Here, the employment relationship involved no written contract and no time was specified for termination of the relationship. Defendant's Exhibit B. Affidavit of Kermit Paschall, Jr., President of Service Transfer, Inc. Under these circumstances,

the plaintiff's employment was terminable at will. *Sea–Land Service, Inc. v. O'Neal*, 224 Va. 343, 297 S.E.2d 647 (1982); *Norfolk Southern Ry. Co. v. Harris*, 190 Va. 966, 976, 59 S.E.2d 110, 114 (1950). Under Virginia law, it is clearly established that no property interest exist in "employment at will." *Skeeter, supra; Harris*, 190 Va. at 976, 59 S.E.2d at 114; *Sabet v. Eastern Va. Medical Auth.*, 611 F.Supp. 388, 396, (E.D. Va.), *aff'd*, 775 F.2d 1266 (4th Cir.1985). This being so, plaintiff was deprived of no constitutionally cognizable property interest.

Plaintiff relies on *City of Norfolk v. Kohler*, 362 S.E.2d 894 (Va.1987) for the proposition that a property interest exists in an ongoing employment relationship when the employment is subject to the employer's general policy that employees are not terminated without cause. However, the affidavits and allegations in this case do not allege or show such a policy. Even if such a policy exists, *Kohler* would not apply because it addresses a different employment situation altogether. In *Kohler*, unlike the present case, the City employee had certain employment rights and guarantees which were provided by the Norfolk City Charter. The asserted vague and unverified employment policy of Service Transfer, a private employer, simply is not analogous to written provisions of a city charter. In addition, the *Kohler* Court never reached the constitutional issues and was decided on a purely statutory basis. *Id.* at 5. This being so, *Kohler* cannot be said authoritatively to define employment related property rights in this constitutional context.

Accordingly, plaintiff's claim based on deprivation of property must fail. Because the property claim has been fully disposed of, the Court will not address the causation issue.

### 2. Liberty Interest

█ Plaintiff claims that defendants deprived him of liberty by barring him from the terminals. Defendants argue that VIT's actions do not implicate any liberty interest.

The Court finds *Cafeteria and Restaurant Workers Union, Local 473, AFL–CIO v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) particularly instructive on this asserted liberty interest. There, the United States Supreme Court was presented with a factually analogous situation involving a cafeteria worker who was barred from a U.S. military facility because she was considered a security risk. As in the instant case, the barred employee in *Cafeteria Workers* was an employee of a private company which provided services on government property.

In addressing the plaintiff's due process claim, the Court stated that "[t]he [f]ifth [a]mendment does not require a trial-type hearing in every conceivable case of government impairment of private interest." *Id.* at 894, 81 S.Ct. at 1748. The Court stated that due process analysis "must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Id.* at 895, 81 S.Ct. at 1748–49. In evaluating these interests, the Court indicated the government was acting not as a lawmaker or regulator, but "as proprietor, to manage the internal operation of an important federal military establishment." *Id.* at 896, 81 S.Ct. at 1749. "All that was denied [plaintiff] was the opportunity to work at one isolated and specific military installation." *Id.* The Court concluded that the barred employee was not "entitled to notice and a hearing when the reason advanced for her exclusion was ... entirely rational and in accord with the contract with [her employer]." *Id.* at 898, 81 S.Ct. at 1750.

In the instant case, VIT investigated the allegations that plaintiff had been fighting with a VIT employee. After concluding the allegations were well founded, VIT barred plaintiff from terminal property by a letter identifying the specific reason for the bar. Significantly, the plaintiff has admitted that this fight occurred. Defendants' Exhibit 1.

Here, like *Cafeteria Workers*, VIT's interest is effectively to manage the govern-

ment property involved. While shipping terminals are somewhat different from military installations, maintenance of the terminals does implicate "essential governmental functions." Va.Code § 62.1–145 (1987); *c.f. United States v. McGlone*, 394 F.2d 75 (4th Cir.1968) (terminals are "border" of United States—search of criminal suspect within the fenced-in terminal facility is border search). For VIT effectively to manage the terminals, it is essential that they maintain order and security around the terminal area which they do by fencing the area which is patrolled with entry and exit through a guarded gate.

The plaintiff's interest here, like that involved in *Cafeteria Workers,* is to be allowed the opportunity to work at a specific facility. While plaintiff also claims to have been deprived the "right to pursue his lawful occupation", there has been absolutely no showing, by affidavit or otherwise, that plaintiff cannot now work for another company as a truck driver because he is barred from entering terminal property. The Court notes that numerous truck driving jobs are available which do not require entry to terminal property. Further, there has been no showing that defendants' actions have resulted in any stigma attaching to plaintiff which may foreclose him from pursuing his occupation. In addition, it is significant that plaintiff has not alleged that defendants acted arbitrarily or capriciously.

In sum, all that has been shown is that defendants barred plaintiff from entering the terminal facility without affording plaintiff notice and a hearing. Plaintiff's only potential liberty interest impaired was his interest in access to terminal property.

The Court finds *Cafeteria Workers, supra,* controlling and concludes that defendants' exclusion of plaintiff in this case did not require notice and hearing. *Cafeteria Workers,* 367 U.S. at 898, 81 S.Ct. at 1750. Like *Cafeteria Workers,* this case merely involves a reasoned exclusion of a citizen from a fenced-in government facility not open to the public.

To hold otherwise would be to ignore the practical realities and necessities which underly VIT's mandate to manage the VPA terminals. It would be absurd to hold that VIT must provide a notice and hearing to every citizen who asserts some interest in entering the terminal property. Such a holding would utterly stifle the effective management of an important government facility by imposing burdensome bureaucratic requirements. The Court concludes that the United States Constitution does not prevent these defendants from barring this plaintiff from this particular facility under the circumstances of this case.

Accordingly, the Court concludes that defendants did not deprive plaintiff of any due process rights and DISMISSES Count II of the complaint.

### B. Count I, Tortious Interference With Contractual Relationship.

Plaintiff alleges that defendants' action in barring plaintiff from terminal property constituted a tortious interference with plaintiff's "employment contract."

Clearly, as discussed above, this "employment contract," having no definite term, is terminable-at-will. While interference with such a contract may provide the basis of an action for tortious interference, "the extent of permissible third-party interference increases as the degree of enforceability of a business relationship decreases." *Duggin v. Adams,* 234 Va. 221, 360 S.E.2d 832, 836 (1987). *See generally* Fitzpatrick, *The Law of Wrongful Discharge in Virginia,* 10 GMU L.Rev. ——— (1987). "Consequently, when a contract is *terminable at will,* a plaintiff, in order to present a prima facie case of tortious interference, must allege and prove not only an *intentional* interference that caused the termination of the at-will contract, but also that the defendant employed '*improper* methods'." *Id.* (citing *Hechler Chevrolet v. General Motors Corp.,* 230 Va. 396, 402, 337 S.E.2d 744, 748 (1985) (emphasis in original)). Such improper methods include "means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules." *Id.*

While the complaint does not allege interference by any particular improper method, it does conclusively state that "the action of the defendants in debarring [plaintiff] was improper, unwarranted and illegal." Motion for Judgment, Count I, paragraph 17 (this case was originally filed in state court and later removed to this Court pursuant to 28 U.S.C. § 1441(a)). During oral argument, plaintiff's counsel indicated that the improper method employed was the alleged due process violation underlying the § 1983 claim. Indeed, plaintiff's counsel conceded that VIT's alleged interference with plaintiff's contract would not be actionable if plaintiff had been afforded a hearing prior to his debarment.

Because VIT was not required to conduct a hearing prior to barring plaintiff, as discussed *supra,* the alleged interference with plaintiff's contract cannot be said to have resulted from any "improper method" employed by VIT. Accordingly, plaintiff has failed to establish a prima facie case and Count I is DISMISSED.

In accordance with the foregoing, this case is DISMISSED.

IT IS SO ORDERED.